## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                    :
SHAMERRA SAUNDERS,                  :
                                    :          CIVIL ACTION
                        Plaintiff   :
        v.                          :          NO. 14-4985
                                    :
CAROLYN W. COLVIN,                  :
COMMISSIONER OF SOCIAL SECURITY,    :
                                    :
                        Defendant   :
_____ :

Henry S. Perkin, M.J.                                    March 10, 2016

## REPORT AND RECOMMENDATION

        Shamerra Saunders ("Plaintiff"), brought this action under 42 USC § 405(g) to

obtain review of the decision of the Commissioner of Social Security denying her claim for

disability insurance benefits ("DIB"). She has filed a Request for Review to which the

Commissioner has responded. For the reasons that follow, it is recommended that the case should

be remanded.

## I.      FACTUAL AND PROCEDURAL BACKGROUND.

        Plaintiff was 29 years old on her alleged onset date and thirty years old at the time

of the ALJ hearing.  (Tr. 44, 168.)  She finished eleventh grade when she became pregnant with

her first child and later completed training as a home health aide.  She had a series of brief jobs at

restaurants and in retail but always left them because "I was very disconnected . . . I didn't really

get along too well with the customers.  I would get my days mixed up when it came to my work

schedule." (Id. 53, 371.)  She found being a home health aide better because it was just her and

the client, but she stopped working after two years in that capacity because it "became very

difficult physically, emotionally, mentally" and she testified that the patients abused her.  Id. at

54-55.  At the time of the ALJ hearing, Plaintiff was living in a shelter with her two daughters

who were eight and thirteen.  She reported being raped in her teenage years. (A.R. 255.)

Plaintiff protectively filed applications for both disability and supplemental

security benefits on July 7, 2011, alleging a disability onset date of April 6, 2011.  (A.R. 108,

166-181.)  Her applications were initially denied and she timely requested a hearing before an

Administrative Law Judge ("ALJ").  (Id. at 110-18, 119.)  A hearing was held on November 12,

2012 before ALJ Arrastia.  (Id. at 36-85.)  In an unfavorable decision dated November 28, 2012,

ALJ Arrastia found that Plaintiff was not disabled and not entitled to receive benefits.  (Id. at 20-

31.)  Plaintiff filed a timely request for review before the Appeals Council, but by order dated

June 26, 2014, the Appeals Council denied her request.  (Id. at 1-5, 18-19, 242-247.)  Thus, the

ALJ's November 28, 2012 decision became the final decision of the Commissioner.

Plaintiff filed an appeal in this Court on August 27, 2014.  Plaintiff's Brief in

Support of her Request for Review was filed on May 28, 2015, and the Commissioner's

Response was filed on June 22, 2015.  This matter was also referred for preparation of a Report

and Recommendation by the Honorable Edward G. Smith on June 22, 2015.  On July 1, 2015,

Plaintiff filed her Reply Brief.

Plaintiff's date last insured for the purpose of her Title II application was

March 31, 2015. (A.R. 192.)  From the alleged onset date of April 6, 2011 through at least the

date of the ALJ's decision, Plaintiff alleges that she suffered from severe medical impairments,

including mild mental retardation/intellectual disability, bipolar disorder, panic disorder without

agoraphobia, post traumatic stress disorder ("PTSD"), borderline personality disorder and

obesity. (A.R. 44, 205, 252-268, 335, 352-355, 369-379, 433-453.)

II.     <u>**STANDARD OF REVIEW.**</u>

       The role of this Court on judicial review is to determine whether there is

substantial evidence in the administrative record to support the Commissioner's final decision.

Any findings of fact made by the Commissioner must be accepted as conclusive, provided that

they are supported by substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence" is

deemed to be such relevant evidence as a reasonable mind might accept as adequate to support a

decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 407 (1971)(quoting <u>Consol. Ed. Co. v. NLRB</u>,

305 U.S. 197, 229 (1938)).  <u>See also</u> <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992),

<u>cert. denied</u>, 113 S.Ct. 1294 (1993).  The issue for this Court is whether the Commissioner's final

decision of "not disabled" should be sustained as being supported by substantial evidence.

Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that

the ALJ applied the proper legal standards in evaluating a claim of disability.  <u>Coria v. Heckler</u>,

750 F.2d 245 (3d Cir. 1984).

       To prove disability, a claimant must demonstrate that there is some "medically

determinable basis for an impairment that prevents [him] from engaging in any 'substantial

gainful activity' for a statutory twelve-month period."  42 U.S.C. § 423(d)(1).  Each case is

evaluated by the Commissioner according to a five-step process:

> The sequence is essentially as follows: (1) if the claimant is currently engaged in
> substantial gainful employment, she will be found not disabled; (2) if the claimant
> does not suffer from a "severe impairment," she will be found not disabled; (3) if
> a severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 and has lasted or is expected to last continually for at least
> twelve months, then the claimant will be found disabled; (4) if the severe
> impairment does not meet prong (3), the Commissioner considers the claimant's
> residual functional capacity ("RFC") to determine whether she can perform work
> she has done in the past despite the severe impairment - if she can, she will be
> found not disabled; and (5) if the claimant cannot perform her past work, the
> Commissioner will consider the claimant's RFC, age, education, and past work

experience to determine whether she can perform other work which exists in the national economy.  *See id.* § 404.1520(b)-(f).

Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431-32 (3d Cir. 1999).

## III.   **THE ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW.**

In his decision, ALJ Arrastia found that Plaintiff suffered from the severe impairments of mood disorder, limited intellectual functioning and obesity.  (A.R. 25.) However, he held that no impairment, and no combination of impairments, met or medically equaled a listed impairment. (Id. at 26-27.)  Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ found that Plaintiff could not return to her prior work as a home health aide, which was performed at the medium level of exertion.. (Id. at 29-30.)  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of light level work, and relying on the vocational expert's testimony, identified the jobs of hand packer and sorter as jobs the Plaintiff would be able to perform.  (Id. at 30-31.)  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work except she is limited to standing and/or walking for four hours.  Further, her ability to push and pull with her lower extremities is limited.  She can occasionally climb ramps and stairs, occasionally kneel, occasionally crouch, and occasionally crawl.  She can frequently balance and frequently stoop, but is precluded from climbing ladders, ropes, and scaffolds.  She must avoid concentrated exposure to temperature extremes, and hazards (machinery, heights).  As for mental, nonexertional limitations, the claimant is limited to simple, routine, repetitive work with no contact with the public.  The claimant must work with things, not data or people, and work primarily on her own, not as part of a group.  (Id. at 27-28.)  Accordingly, the ALJ found that Plaintiff was not disabled from April 6, 2011 through November 28, 2012.  (Id. at 31.)

In her Request for Review, Plaintiff maintains that the ALJ erred in (1) failing to mention and evaluate multiple GAF scores below 50 (Pl.'s Br., pp. 4-8; Reply Br., pp. 1-2); and (2) failing to give significant weight to the opinion of James A. Wrable, Ph.D. (Pl.'s Br., pp. 8-12; Reply Br., pp. 2-4).

## IV.   DISCUSSION.

### A.   Whether the ALJ Erred By Failing to Mention GAF Scores Below 50.

Plaintiff contends that the ALJ committed error by not mentioning or discussing Global Assessment of Functioning ("GAF")[1] scores in his decision.  In the course of Plaintiff's mental health treatment at New Life Community Health Services, Inc.,[2] she was assigned a GAF of forty-five on September 2, 2011.[3] (A.R. 440.) In addition, James A. Wrable, Ph.D., conducted an extensive Psychological/Vocational Evaluation of Plaintiff on May 7, 2012 and assigned her a GAF score of forty-eight. (A.R. 369-379.)  GAF scores between 41 to 50 indicate serious symptoms, including suicidal ideation or severe obsessional rituals, or any serious impairment in social or occupational functioning. Diagnostic and Statistical Manual of Mental Disorders Text

---

[1]   Prior to 2013, the Global Assessment of Functioning ("GAF") was a numeric scale of one to one-hundred that mental health professionals and physicians used to rate an individual's overall psychological, social and occupational functioning. Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") at 32 (4th ed. 2000). The GAF scale ranges from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning.  Id. at 30-32, 34. GAF scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id. at 34.
       The Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders discontinued use of the GAF scale due to "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders: DSM-5 ("DSM-5") 16 (5th ed. 2013).

[2]   Plaintiff underwent treatment at New Life for approximately three to four years.  (A.R. 373.)

[3]   Plaintiff was also assigned a GAF score of forty to forty-five by New Life Community Health Services, Inc. on September 30, 2009 prior to her alleged onset date of disability.  (A.R. 259.)

Revision ("DSM-IV-TR"), 4th ed. 2000, p. 34.  The ALJ made no mention of the two serious

GAF scores in his decision.

As my colleague, the Honorable Jacob P. Hart recently recognized in his Report

and Recommendation in Talley v. Colvin, CIV.A. No. 15-4615 (E.D. Pa. Jan. 28, 2016),

Courts in this circuit have taken conflicting approaches as to the significance of an ALJ's failure to discuss a GAF score in the serious range. In Gilroy, supra, the Court of Appeals for the Third Circuit, writing in a non-precedential case, found that remand in such a case was not necessary, where the psychiatrist had not expressed any opinion regarding the claimant's specific limitations, and the ALJ's decision clearly reflected substantial evidence supporting his conclusion, as well as an explanation why the evidence put forward by the claimant did not persuade him.

Nevertheless, even after Gilroy was decided, courts in this district have asserted that a failure to discuss a GAF score in the "serious" range actually requires remand. Joseph v. Astrue, Civ. A. No. 11-2668, 2012 WL 4459796 at *6 (E.D. Pa. Apr. 26, 2012); West v. Astrue, Civ. A. No. 08-1585, 2010 WL 1659712 at **4-5 (E.D. Pa. Mar. 23, 2009), citing Watson v. Astrue, Civ. A. No. 08-1858, 2009 WL 678717 (E.D. Pa. Mar. 13, 2009), Escardille v. Barnhart, Civ. A. No. 02-2930, 2003 WL 2149999 (E.D. Pa. Jun. 24, 2003) and earlier cases. In Escardille, supra, moreover, the judge described a GAF score of 50 as "a finding that indicated [the claimant] was unable to perform competitive work on a sustained basis." 2003 WL 2149999 at *2.

In Cassler v. Colvin, Civ. A. No. 12-015, 2014 WL 4249776 (E.D. Pa. Aug. 28, 2014), the Honorable James Knoll Gardner ordered remand, adopting a reasoned approach which took account of recent cases in which remand was not required. In the Report and Recommendation he adopted, the Honorable Timothy R. Rice wrote:

A GAF score ... "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability." Watson v. Astrue, No. 08-1858, 2009 WL 678717 at *5 (E.D. Pa. Mar. 13, 2009) (emphasis omitted) (citing Colon v. Barnhart, 424 F. Supp.2d 805, 812 (E.D. Pa. 2006)); Dougherty [v. Barnhart, Civ. A. No. 0505383, 2006 WL 2433792 at *9. The few cases in which an ALJ's opinion was affirmed despite a failure to mention GAF scores are distinguishable. In Rios v. Astrue, for example, the ALJ mentioned a GAF score of 50 to 55 but failed to mention two

6

additional GAF scores of 50. No. 09-5004, 2010 WL 3860458 at
*8 (E.D. Pa. Sep. 30, 2010, aff'd Rios v. Comm'r Soc. Sec., 444 F.
App'x 532, 535 (3d Cir. 2011). The court in Rios explicitly
distinguished West, Watson, Robleto [v. Barnhart, Civ. A. No.
05-4843, 2006 WL 2818431 at *8 (E.D. Pa. Sep. 28, 2006)], and
Dougherty, where the ALJs either failed to address GAF scores at
all or cherry-picked higher scores. Id. Like the ALJs in West and
Dougherty, the ALJ here failed to mention those GAF scores
indicating serious symptoms.

In Purnell v. Astrue, 662 F. Supp. 402 (E.D. Pa. 2009), the ALJ
failed to mention a treating physician's GAF score of 50, but the
treating physician found only mild or moderate limitations in
certain categories and no marked or extreme categories. Id. at
414-15. Here, Cassler received a GAF score of 65, but his treating
physician, who continued to declare him "temporarily disabled" for
a period of more than 12 continuous months, also noted that his
GAF score had been as low as 30 in the past year.

In Hendrickson v. Astrue, No. 07-5345, 2008 WL 3539621 (E.D.
Pa. Aug. 11, 2008), the ALJ failed to mention a GAF score of 45 to
48 but mentioned and discussed three subsequent GAF scores of
50 issued by the same physician. Id. at *4. Here, the ALJ
mentioned a score of 65 while ignoring all lower GAF scores.

In Gilroy v. Astrue, 351 F. App'x 714 (3d Cir. 2009), an ALJ's
failure to mention or discuss a one-time GAF score of 45 did not
require remand where there was only one GAF score and it was not
accompanied by any reports or notes indicating impairment. Id. at
716. Cassler's unmentioned GAF scores accompany notes
documenting a long history of behavioral issues unacknowledged
by the ALJ.

2104 WL 4249776 at *9 and n. 7. (Citations to case record excluded). Judge Rice
concluded:

Although [GAF scores between 30 and 55] do not require the ALJ
to find Cassler disabled and award benefits, they do require the
ALJ to reconcile them with his assessment of Cassler's functional
capacity. See Far[]gnoli [v. Massanari, 247 F.3d 34, 41 (3d Cir.
2001)], Burnett[ v. Commissioner of Social Security, 220 F.3d
112, 121 (3d Cir. 2000)], Cotter[ v. Harris, 642 F.2d 700, 704 (3d
Cir. 1981)]. His failure to do so makes it impossible to determine

7

> how he came to his findings regarding Cassler's functional
> limitations.

Id. at *10.

> Thus, a failure to mention GAF scores in the serious range requires
> remand under the general principle, as set forth in Far[]gnoli and similar cases,
> that they constitute significant evidence which must be discussed in order to make
> the ALJ's decision reviewable. Exceptions are made uncommonly, and only
> where the ALJ has adequately discussed other substantial evidence that somehow
> renders the failure to discuss the GAF scores harmless.

Id. at 4-9.  In an unprecedential opinion, the United States Court of Appeals for the Third Circuit

recently noted:

> We note that the latest edition of the Diagnostic and Statistical Manual of Mental
> Disorders, DSM-5, abandoned the GAF scale as a measurement tool. Because of
> this, the Social Security Administration now permits ALJs to use GAF ratings as
> opinion evidence when assessing disability claims involving mental disorders; but
> instructed that a "GAF score is never dispositive of impairment severity," and an
> ALJ should not "give controlling weight to a GAF from a treating source unless it
> is well supported and not inconsistent with other evidence." SSA AM-13066 at 5
> (July 13, 2013).

Hughes v. Comm'r of Soc. Sec., 2016 U.S. App. LEXIS 894, *6-7 n.2 (3d Cir. Jan. 20, 2016).  It

is this Court's duty to decide whether the ALJ's findings are supported by substantial evidence,

and the adequacy of the ALJ's explanations is at issue because it impacts the Court's ability to

conduct the necessary review.  See Thomas v. Comm'r of Soc. Sec., 625 F.3d 789, 800 (3d Cir.

2010); Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2000); Burnett v. Comm'r of Soc. Sec.,

220 F.3d 112, 220 (3d Cir. 2000).  Based on Gilroy and cases from this District and Circuit,

Plaintiff's claim will fail if either: (1) the doctors who issued GAF scores did not "express any

opinions regarding [her] specific limitations," or (2) if the ALJ provided a clear and satisfactory

explanation of the basis upon which he dismissed the probative weight of the omitted GAF

scores.  Packard v. Astrue, CIV.A. No. 11-7323, 2012 U.S. Dist. LEXIS 143618, *9 (E.D. Pa.

Oct. 4, 2012)(Baylson, J.).

Turning to the instant case, the ALJ examined the Plaintiff's level of functioning
and medical evidence of record as follows:

In activities of daily living, the claimant has mild restriction.   As stated above,
she has demonstrated the ability to maintain a household with two small children.

In social functioning, the claimant has moderate difficulties.  She testified that she
does not like being in crowds (by which she said she meant groups of more than
seven strangers).  She reported becoming more aggressive after discontinuing her
medication for three months (Exhibit 11F).

With regard to concentration, persistence or pace, the claimant has moderate
difficulties.  She complained of difficulty concentrating at the psychiatric
re-evaluation (Exhibit 11 F).  Her level of attention/concentration  was assessed as
being moderately impaired in the intellectual testing in Exhibit 6F.  She was
evidently able to maintain a reasonable level of attention and concentration
through her intelligence testing.

As for episodes of decompensation, the claimant has experienced no episodes of
decompensation, which have been of extended duration.

. . . .

The medical evidence of record contained a number of emergency room records
for generally minor or temporary complaints (back/neck pain, abdominal pain,
flu-like symptoms, scalp itchiness, throat problems) and no treatment for mental
health conditions (Exhibits 3F, 7F-10F, 12F).

The claimant was treated at the New Life Community Mental Health Services,
Inc., starting in September 2009 (Exhibit 2F).  During the intake evaluation, she
reported she lived with her two children (ages 5 and 10), her parents, and a
younger brother.  The initial diagnostic impression was bipolar affective disorder,
mixed, without psychotic features.  She was seen by a psychiatrist for medication
management.  By October 2009, she was sleeping better.  She did have periods of
confusion and disorientation at times, periods of anxiety, and housing and marital
problems.  The several medication checks from October 2009 to June 2011
showed she was generally doing fairly well.  In September 2011, a psychiatric
re-evaluation was done (Exhibit 11F).  She reported feeling good on her current
medications.  She displayed no manic symptoms, but was still having depressive
periods.  She endorsed difficulty getting to sleep, decreased ability to

9

concentrate, and intermittent feelings of hopelessness, helplessness, and worthlessness.   Since April 2011, she had been living in a shelter with her two children.  As for recent medication checks, the claimant reported in September 2011 that she felt well balanced.  She was doing well on an increased dose of Prozac.  In October 2011, the medication continued to be efficacious.  In November 2011, she had some depression so her dosage of Wellbutrin was increased.  In December 2011, she had mild depression and her condition was essentially unchanged. In January 2012, she was slowly improving.  In February 2012, she was essentially unchanged. In April 2012, she was doing well and was stable.  In May 2012, she was again doing well and stable.  In September 2012, she reported non-compliance with taking her medication for three months, and she reported feeling more aggressive.

The claimant was evaluated by psychologist, James Wrable, Ph. D., on May 7, 2012, at the referral of her JEVS/MPP case coordinator (Exhibit 6F). Among the tests administered, intellectual testing was performed. On the Wechsler Adult Intelligence Scale - Revised (WAIS-R), she achieved a verbal IQ score of 74, a performance IQ score of 69, and a full scale IQ score of 71. On the Wide Range Achievement Test 3 (WRAT-3), she achieved a reading level at the 7th grade. The diagnostic impression included borderline intellectual functioning (not mild mental retardation).

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant testified to her age (30), date of birth (January 22, 1982), height (4'6") and weight (200 pounds).  She testified she lives with her two children (ages 8 and 13).  She left high school in the 11th grade because she became discouraged.  She confirmed an ability to read and she completed vocational training as a CNA  She then testified to her work background.  The claimant testified to her mental health symptoms.  She also testified to some physical problems. She testified to her activities of daily living, which included taking public transportation, attending doctor's appointments, reading, and cooking.

In terms of the claimant's mental health impairments, treatment records suggest she has responded well to medication (Exhibit 11F).  Her good response occurred despite having been in a highly stressful situation, i.e., living in a shelter with her two children for one and a half years. She did stop medicines for three months and reported becoming more aggressive; there is, however, no indication that she decompensated.  The treatment records at the New Life Community Mental

Health Services (Exhibits 2F, 11F) are given more weight than the results and findings of the one-time examination by Dr. Wrable at Exhibit 6F.

A State agency psychologist completed a Psychiatric Review Technique Form (Exhibit 1A), assessing mild impairment in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, and pace. There were no episodes of decompensation, each of extended duration. The State agency psychological consultant's mental assessment is given great weight because it is consistent with the record as a whole.

A State agency medical consultant assessed a residual functional capacity for a limited range of light work (Exhibit 1A). I accord the assessment great weight. It is also consistent with the record as a whole.

I recognize that obesity can exacerbate the effect of other impairments and have taken this into account in arriving at the residual functional capacity herein per SSR 02-lp.

In sum, the above residual functional capacity assessment is supported by the medical evidence of record. I have considered all of the medical evidence, including from the treating sources and from the State agency, as outlined above. I have considered the claimant's own subjective allegations of disabling impairments and have found them not fully credible. In evaluating the claimant's testimony, I find that, despite her complaints, there is insufficient medical evidence to establish disability. There is nothing in the record to indicate she is unable to do work at the light level of exertion with the necessary, nonexertional limitations.

(A.R. 29-30.)

This court agrees that the ALJ did not specifically mention Plaintiff's GAF scores of forty five and forty eight, and we next consider whether the ALJ discussed the underlying records wherein the omitted GAF scores were found. On September 2, 2012, Plaintiff received a GAF of forty five at New Life during a psychiatric re-evaluation. (Id. at 436-440.) The summary given by the ALJ surrounding this assessment:

In September 2011, a psychiatric re-evaluation was done (Exhibit 11F). She reported feeling good on her current medications. She displayed no manic

11

symptoms, but was still having depressive periods.  She endorsed difficulty getting to sleep, decreased ability to concentrate, and intermittent feelings of hopelessness, helplessness, and worthlessness.   Since April 2011, she had been living in a shelter with her two children.  As for recent medication checks, the claimant reported in September 2011 that she felt well balanced.  She was doing well on an increased dose of Prozac.  In October 2011, the medication continued to be efficacious.  In November 2011, she had some depression so her dosage of Wellbutrin was increased.  In December 2011, she had mild depression and her condition was essentially unchanged. In January 2012, she was slowly improving. In February 2012, she was essentially unchanged. In April 2012, she was doing well and was stable.  In May 2012, she was again doing well and stable.  In September 2012, she reported non-compliance with taking her medication for three months, and she reported feeling more aggressive.

(A.R. 28.)  Thus, the ALJ discussed the September 2011 report from New Life within which the forty five GAF score was contained in a cursory fashion, and did not discuss whether treatment providers at New Life related the assigned GAF score to specific functional limitations.  The forty eight GAF score assigned to Plaintiff on May 7, 2012 by James A. Wrable, Ph.D., was also not discussed by the ALJ in his decision.  Dr. Wrable's findings of his psychiatric evaluation of Plaintiff were examined by the ALJ as follows:

> In social functioning, the claimant has moderate difficulties.  She testified that she does not like being in crowds (by which she said she meant groups of more than seven strangers).  She reported becoming more aggressive after discontinuing her medication for three months (Exhibit 11F).

> With regard to concentration, persistence or pace, the claimant has moderate difficulties.  She complained of difficulty concentrating at the psychiatric re-evaluation (Exhibit 11 F).  Her level of attention/concentration was assessed as being moderately impaired in the intellectual testing in Exhibit 6F.  She was evidently able to maintain a reasonable level of attention and concentration through her intelligence testing.

> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

> . . . .

12

> The claimant was evaluated by psychologist, James Wrable, Ph. D., on May 7, 2012, at the referral of her JEVS/MPP case coordinator (Exhibit 6F). Among the tests administered, intellectual testing was performed. On the Wechsler Adult Intelligence Scale - Revised (WAIS-R), she achieved a verbal IQ score of 74, a performance IQ score of 69, and a full scale IQ score of 71. On the Wide Range Achievement Test 3 (WRAT-3), she achieved a reading level at the 7th grade. The diagnostic impression included borderline intellectual functioning (not mild mental retardation).
>
> . . . .
>
> The treatment records at the New Life Community Mental Health Services (Exhibits 2F, 11F) are given more weight than the results and findings of the one-time examination by Dr. Wrable at Exhibit 6F.
>
> A State agency psychologist completed a Psychiatric Review Technique Form (Exhibit 1A), assessing mild impairment in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, and pace.  There were no episodes of decompensation, each of extended duration.  The State agency psychological consultant's mental assessment is given great weight because it is consistent with the record as a whole.
>
> A State agency medical consultant assessed a residual functional capacity for a limited range of light work (Exhibit 1A).  I accord the assessment great weight.  It is also consistent with the record as a whole.

(A.R. 26-27, 28-29.)  Dr. Wrable completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on May 7, 2012. (A.R. 378-379.) This was not examined by the ALJ in the decision. Dr. Wrable imposed "marked" (defined as "Ability to function in this area is limited") limitations on Plaintiff's abilities to function in the following area: relate to coworkers; deal with the public; use judgment; deal with work stresses; understand, remember, and carry out complex, and detailed but not complex, instructions; behave in an emotionally stable manner; and relate predictably in social situations. (Id.) In support of these restrictions, Dr. Wrable observed that Plaintiff suffered from a range of emotional symptoms (including

anhedonia, fatigue, panic attacks, and mania) that caused her to "at times present what appears to others to be an absence or lack of personal control that would cause her to appear or be interpreted as peculiar or inappropriate in social/work settings." (A.R. 378.) He added that Plaintiff's symptoms "would likely be increased in a work setting as she will have to both battle controlling herself as well as deal with the inherent stress that would be expected to be part of any job." (Id.) Dr. Wrable observed that Plaintiff's cognitive deficits could result in a longer learning curve and "may create frustration and provoke additional stress causing increased psychiatric symptomatology including agitation that may lead her to snap at others or avoidance of others and take her off task or cause her to miss work." (A.R. 379.)

Under "Making Personal-Social Adjustments", Dr. Wrable wrote the following:

> Ms. Saunders suffers from a range of emotional symptoms which cause her mood
> to shift. At times she finds that her mood will be anxious and then depressed and
> then irritable/angry. She will likely be more prone to such when placed amongst
> others/in social or work situations. Ms. Saunders has typically responded to
> external stressors by avoiding them which is just the opposite of what is required
> on the job and she will need to learn appropriate coping skills to allow her to
> function in the social/work place.

(Id.)  Dr. Wrable added that Plaintiff "is at risk for decompensation were she placed in a stressful environment." (Id.) Dr. Wrable further observed that "[a]ny pressure or push for increased performance is going to exacerbate her stress and put her at further risk." (Id.) Dr. Wrable responded "yes" to Additional Question 2 asking if Plaintiff would likely miss three or more days of work per month due to psychological symptoms or difficulties, adding that Plaintiff could miss more than three days per month, depending upon stress levels. (Id.)

The ALJ omitted any discussion of the functional limitations found by Dr. Wrable.  (Id. at 378-79.)  The ALJ rejected the findings of Dr. Wrable by stating: "The treatment

records at the New Life Community Mental Health Services (Exhibits 2F, 11F) are given more weight than the results and findings of the one-time examination by Dr. Wrable at Exhibit 6F." (A.R. 29.)  Plaintiff's claim that the ALJ erred by not mentioning the forty-eight GAF score assigned by Dr. Wrable has merit, therefore, because Dr. Wrable expressed an opinion regarding her specific limitations and the ALJ did not provide a clear and satisfactory explanation of the basis upon which he dismissed the probative weight of the omitted GAF scores.  Packard v. Astrue, CIV.A. No. 11-7323, 2012 U.S. Dist. LEXIS 143618, *9 (E.D. Pa. Oct. 4, 2012)(Baylson, J.).  Thus, remand is appropriate and recommended.

   **B.      Whether the ALJ Erred By Failing to Give Sufficient Weight to the Opinion of Dr. Wrable.**

            As previously examined, the ALJ briefly discussed Dr. Wrable's report (A.R. 28) without explicitly discussing the functional limitations that Dr. Wrable imposed, stating that he gave more weight to the treatment records of New Life Community Health Services.  The ALJ went on to state that he gave "great weight" to the opinion of the non-examining State agency psychologist, Sharon Becker Tarter, Ph.D., who opined that Plaintiff only experienced moderate difficulties with regard to social functioning and concentration, persistence, or pace. (A.R. 29.)

            Plaintiff disputes that the New Life Treatment records undermine Dr. Wrable's findings.  Dr. Wrable assigned Plaintiff a GAF score of forty-eight, indicative of severe symptoms (A.R. 377), which is consistent with the forty-five GAF score assigned to Plaintiff on September 2, 2011 during the course of her treatment at New Life.  (A.R. 440.) Dr. Wrable conducted an extensive mental evaluation of Plaintiff that included objective testing ("WAIS-R", "WRAT-3"). (A.R. 369-377.) He explained at length how he reached his conclusions about the

restrictions he placed on Plaintiff's ability to function in a work setting. (A.R. 378-379.) For example, Dr. Wrable observed that Plaintiff's borderline intelligence and lower than average reading, spelling, and arithmetic skills may affect her learning curve and ability to retain information.  (A.R. 379.) Dr. Wrable wrote that Plaintiff was "at risk for decompensation were she placed in a stressful environment even an innocuous work environment." (Id.)  The New Life treatment notes show that Plaintiff lived in a shelter with her children for an extended period. (A.R. 439, 444-448.)  Dr. Wrable reported "[n]o significant treatment response as yet." (A.R. 379.)  Contrary to the Defendant's argument, Plaintiff argues that the fact that she showed some improvement during the course of her treatment at New Life does not justify disregarding Dr. Wrable's findings nor that she is able to function in a full-time work setting without decompensating. Dr. Wrable believed that decompensation was a real possibility if Plaintiff returned to a work setting (A.R. 379.)

The Commissioner generally accords more weight to the opinion of an examining source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527 (c)(1), 416.927 (c)(1). The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight the Commissioner will give that opinion. 20 C.F.R. §§ 404.1527 (c)(3), 416.927 (c)(3). The opinion expressed by Sharon Becker Tarter, Ph.D., a non-examining state agency psychologist who conducted only a record review, is dated September 19, 2011, eight months before Dr. Wrable conducted his evaluation of Plaintiff. Plaintiff argues that Dr. Wrable's opinion is entitled to greater weight than that of Dr. Tarter, who never examined Plaintiff and who did not have the benefit of reviewing Dr. Wrable's report. Plaintiff notes that Dr. Wrable's assessment of Plaintiff's limitations is supported by the

extensive interview he conducted with Plaintiff, and the objective testing of Plaintiff which he conducted. As such, Plaintiff further argues that Dr. Wrable's opinion is entitled to greater weight than that of Dr. Tarter. 20 C.F.R. §§ 404.1527 (c)(1), (3), 416.927 (c)(1), (3). If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. SSR 96-5p.

We are of the opinion the ALJ did not fully weigh the findings of Dr. Wrable against the findings of Dr. Tarter.  In addition, the ALJ failed to give an adequate explanation for rejecting Dr. Wrable's opinions.  On remand, the ALJ must reassess the findings of Dr. Wrable and their effect on Plaintiff's ability to perform limited light work.  In addition, if such findings are rejected, the ALJ must provide an adequate explanation for such rejection.

## V.    CONCLUSION.

Having reviewed the evidence of record, we cannot find that substantial evidence exists to support the opinion and conclusions of the ALJ as to Plaintiff's alleged disability.  If the ALJ should determine that Plaintiff does not qualify for disability as a result of her impairment or combination of impairments, the ALJ must articulate the weight applied to the evidence and the reasons for rejecting Plaintiff's claim of disability.  Finally, Plaintiff should remain cognizant that the ultimate burden of proving disability rests with her.

Therefore, I make the following:

**RECOMMENDATION**

AND NOW, this      10th      day of March, 2016, it is RESPECTFULLY RECOMMENDED that the relief sought by Plaintiff should be GRANTED in part, and the matter should be REMANDED to the Commissioner in accordance with the fourth sentence of 42 U.S.C. § 405(g).

BY THE COURT:


*/s/ Henry S. Perkin*
HENRY S. PERKIN,
United States Magistrate Judge

18